# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 1095 | **DATE** | 9/22/2003 |
| **CASE TITLE** | Matz vs. Household Intl Tax Reduction Investment Plan | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 10/2/2003 at 9:30 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION & ORDER. Defendant's motion for summary judgment [140-1] is denied, as is plaintiff's cross-motion for partial summary judgment. Additionally, for administrative purposes, plaintiff's motion for class certification [144-1], which was filed but never briefed due to an agreement between the parties, is denied without prejudice. Plaintiff may renew his motion for class certification after the parties determine whether or not to request an interlocutory appeal of this order. This matter is set for status on Thursday, October 2, 2003.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | SEP 2 4 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | 03 SEP 23 AM 9:55 | date mailed notice | |
| | Date/time received in central Clerk's Office | | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ROBERT J. MATZ, )
)
Plaintiff, )
) Case No. 96 C 1095
v. )
)
HOUSEHOLD INTERNATIONAL TAX ) Judge Joan B. Gottschall
REDUCTION INVESTMENT PLAN, et al. )
)
Defendants. )

## MEMORANDUM OPINION & ORDER

Plaintiff Robert Matz sued the Household International Tax Reduction Investment Plan ("the Plan") under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Matz claims that his participation in the Plan was terminated as a result of a reorganization at Household International, Inc. ("Household") that occurred between August 1994 and June 30, 1996 when Household sold the assets of Hamilton Investments, Inc. ("Hamilton"), discontinued Household Mortgage Services ("HMS"), sold its Maryland, Virginia, California, Indiana and Illinois branches of Household Bank, F.S.B. ("Household Bank") and sold Alexander Hamilton Life Insurance Co. ("AHLIC"). When Matz's employment at Hamilton ended, he was not fully vested in the Plan. Although he received 100% of all contributions he made to the Plan, he received only 60% of the matching contributions Household made to the Plan on his behalf. The remaining 40% of the matching contributions were forfeited, and used to reduce Household's future matching contributions for other participants in the Plan. According

to Matz, the alleged reorganization resulted in a partial termination of the Plan. Under the terms of the Plan, as required by 26 U.S.C. § 411(d)(3), in the event the Plan is partially terminated with respect to a group of participants, each affected participant becomes fully vested. Thus, Matz argues that he is entitled to the contributions (totaling $7,289.92) he forfeited to the Plan, as are the other members of the class he seeks to represent.

The Plan has moved for summary judgment, arguing that even if a reorganization occurred and the employer-initiated terminations at Hamilton, HMS, Household Bank, and AHLIC were related,[1] Matz cannot establish that the Plan was partially terminated because he cannot show a significant reduction in the number of plan participants. Matz has filed a cross-motion for partial summary judgment, effectively (though indirectly) asking the court to find that a partial termination has occurred. For the reasons set forth below, the court denies both the Plan's motion for summary judgment and Matz's cross-motion for partial summary judgment.

**Procedural History**

This case has already been to the Seventh Circuit twice and the Supreme Court once in an effort to resolve the question of how to evaluate whether a partial termination occurred. Discovery has been stayed pending resolution of the legal issues. As explained in a previous

---

[1] The court previously ruled, and the Seventh Circuit affirmed, that if the plaintiff can establish that terminations that occurred over multiple plan years were related because they arose from a single corporate event, those terminations may be aggregated to determine whether a partial termination occurred. *Matz v. Household Int'l Tax Reduction Inv. Plan*, No. 96 C 1095, 1999 WL 754659, at *7 (N.D. Ill. Sept. 9, 1999) ("District Court Decision II"), *aff'd* 277 F.3d 971, 977 (7th Cir. 2000), *vacated on other grounds*, 533 U.S. 925 (2001), *reaff'd* 265 F.3d 572, 576 (7th Cir. 2001). Whether there was a reorganization and whether the terminations at Hamilton, HMS, Household Bank and AHLIC were related to that single corporate event of reorganization are disputed issues of material fact.

2

decision in this case, generally the "termination of a number of employees does not constitute a 'partial termination' [of a benefits plan] unless there is a significant reduction in plan participants." *Matz v. Household Int'l Tax Reduction Inv. Plan*, No. 96 C 1095, 1998 WL 851491, at *2 (N.D. Ill. Dec. 1, 1998) ("District Court Decision I").[2] To assess the "significance" of such a reduction, courts frequently use the significant percentage test, "using the ratio of terminated plan participants over total plan participants." *Matz v. Household Int'l Tax Reduction Inv. Plan*, 227 F.3d 971, 975 (7th Cir. 2000) ("Matz I").[3] In briefing the Plan's first motion for summary adjudication of issues, the Plan argued that for the significant percentage test, the court should divide the number of nonvested (*i.e.*, not fully vested), involuntarily terminated participants by the total number of plan participants. Matz, on the other hand, argued that all participants in the Plan who were involuntarily terminated should be included in the numerator, whether they were vested or nonvested. Although this court was inclined to agree with the Plan's position, it felt constrained to adhere to the IRS's construction, as Matz urged, which measures the significance of a reduction in plan participants by dividing the total number of involuntarily terminated plan participants (vested and nonvested) by the total number of plan participants. *District Court Decision I*, 1998 WL 851491, at *4-5. Based on the IRS's construction, the court denied that portion of the Plan's motion. *Id.* at *5.

In *Matz I*, the Seventh Circuit affirmed this court's decision, concluding that the IRS's

---

[2]This decision was reversed on other grounds. Because the history of this case is set forth in the background section, the complicated subsequent histories are omitted from citations to the various *Matz* opinions.

[3]This decision was vacated on other grounds. *See* footnote 2.

3

construction was reasonable and thus was entitled to deference. *Matz I*, 227 F.3d at 976 (following *Weil v. Retirement Plan Admin. Comm.*, 933 F.2d 106, 107 (2d Cir. 1991)). The Supreme Court, however, vacated *Matz I* and remanded the case to the Seventh Circuit for further consideration in light of *United States v. Mead Corp.*, 533 U.S. 218 (2001), a decision in which the Court addressed the levels of deference owed by the judiciary to actions by administrative agencies. *Household Int'l Tax Reduction Inv. Plan v. Matz*, 533 U.S. 925 (2001).

On remand in *Matz v. Household International Tax Reduction Investment Plan*, 265 F.3d 572, 574-75 (7th Cir. 2001) ("*Matz II*"), the Seventh Circuit determined that the IRS's position was not entitled to any deference. Specifically, the Seventh Circuit found that the IRS's position was an informal agency policy pronouncement rather than the result of formal administrative procedures, and thus not entitled to mandatory deference. *Id.* at 574. Nor was the IRS's position entitled to deference based on its persuasiveness. *Id.* at 574-75. Noting that the purposes of the partial termination statute are "to protect employees' legitimate expectation of pension benefits, and to prevent employers from abusing pension plans to reap tax benefits," the Seventh Circuit agreed with the Plan "that counting vested participants 'would further neither of these purposes.'" *Id.* at 575 (citing *Matz I*, 277 F.3d at 975). "'Vested participants do not need further protection for their pension benefits and do not benefit from a finding of partial termination. Their benefits, by virtue of vesting, are nonforfeitable. The employer gains nothing either. No monies revert back to it . . . .'" *Id.* (citing *Matz I*, 277 F.3d at 975). Accordingly, the Seventh Circuit ruled that "only non-vested participants should be counted in determining whether partial termination of a pension plan has occurred." *Id.* at 575.

4

Now before the court are the Plan's motion for summary judgment, and Matz's cross-motion for partial summary judgment.

**Analysis**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court must examine the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In determining whether a partial termination occurred, the percentage of excluded plan participants is generally the most persuasive factor. *Admin. Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 987 (6th Cir. 1999). ERISA does not define what percentage under the significant percentage test is sufficient to constitute a partial termination. *Morales v. Pan Am. Life Ins. Co.*, 718 F. Supp. 1297, 1303 (E.D. La. 1989). According to the Plan Termination Standards issued by the Treasury Department to assist IRS

agents in assessing whether a partial termination has occurred,

> [t]here is no fixed percentage . . . that we may set as [a] guideline[]. The facts and circumstances in each case must be considered . . . . [A] 20% reduction in 'employees covered by the Plan' would not by itself constitute a partial termination. However, coupled with additional factors like a plant closing, a reversion of assets to the employer as a result of termination of the plan or prohibited discrimination, 20% might be enough.

*Id.* (citation and internal quotation marks omitted); *In re Gulf Pension Litig.*, 764 F. Supp. 1149, 1164 (S.D. Tex. 1991); *Halliburton Co. v. Comm'r of Internal Revenue*, 100 T.C. 216, 237 (T.C. 1993). The Plan, in moving for summary judgment, contends that under the significant percentage test, Matz cannot show a percentage anywhere near 20%.

Before turning to the actual calculations, the court must first address the formula to be used for the significant percentage test. The court believes that the best single gauge of the effect of the terminations on the goals of ERISA's partial-termination provision is the formula proposed by the Plan: (1) determine the total number of nonvested plan participants who were involuntarily terminated without cause from Hamilton, HMS, AHLIC and the branches of Household Bank that were sold ("the Reorganization Entities"); and (2) divide that number by the total number of plan participants during the period in which the partial termination allegedly occurred. This formula provides the percentage of participants, terminated without cause due to the reorganization, who will forfeit assets back to the Plan. The formula thus provides an indication (albeit approximate) of the portion of plan assets forfeited to the employer as a result of the terminations. Put differently, by comparing the affected group of the nonvested, involuntary terminees to the Plan as a whole, the formula "should establish the significance of

6

the transaction [*i.e.*, reorganization] in relation to total plan assets." Vincent Amoroso, et al., *A Policy Premise to Partial Terminations*, N.Y.U. Review of Employee Benefits & Executive Compensation (2002), at 8-44.

As this court understands it, however, the Seventh Circuit's decision in *Matz II* forecloses the use of that formula. The Seventh Circuit stated that "only non-vested participants should be counted in determining whether partial termination of a pension plan has occurred," *Matz II*, 265 F.3d at 575, strongly suggesting, if not explicitly stating, that only non-vested participants should be included in *both* the numerator and denominator of the equation. That was the approach taken by the court in *Gulf Pension*, 764 F. Supp. at 1165-68, a decision which the Seventh Circuit referenced approvingly in *Matz I*. In *Gulf Pension*, the court excluded vested participants from the entire equation, based on the belief that excluding them only from the numerator would result in an artificially low percentage. *Gulf Pension*, 764 F. Supp. at 1165, 1165 n.10. Although the *Gulf Pension* court stated in a footnote that it was excluding only vested terminees from the equation, it actually excluded vested terminees from the numerator, and vested participants (rather than just vested terminees) from the denominator. *Compare Gulf Pension*, 764 F. Supp. at 1165 n.10 *with* 764 F. Supp. at 1168. Accordingly, under the *Gulf Pension* formula, the number of nonvested employees who were involuntarily terminated without cause is divided by the number of nonvested participants in the plan.[4] The Seventh Circuit explicitly expressed its

---

[4]The number of nonvested participants in the plan is determined by taking the number of nonvested participants at the beginning of the period in question, and adding the number of nonvested participants who joined the plan during that period. *Gulf Pension*, 764 F. Supp. at 1168.

7

approval of that method, stating that "[p]urely from a policy standpoint, we believe that the method adopted in *Gulf Pension Litigation* best furthers the purposes of the partial termination statute." *Matz I*, 227 F.3d at 976. Thus, although the *Matz I* court expressed approval of the logic of the Plan's position, *id.* at 975, it actually rejected the Plan's position (in part) by concluding that, as in *Gulf Pension*, the entire equation, rather than just the numerator, should exclude vested participants.

This court acknowledges that the issue of who should be included in the *denominator* of the formula was not a subject of dispute before the Seventh Circuit. Indeed, until now, that issue has never been disputed in this case: both Matz and the Plan previously took the position that the denominator should be the total number of plan participants during the period in question. Nevertheless, the Seventh Circuit's holding is unequivocal, and it is consistent with the Court of Appeal's stated preference in *Matz I* for the approach taken in *Gulf Pension*.

The *Gulf Pension* formula is a good indicator of the impact of the terminations on the class of vulnerable (*i.e.*, nonvested) employees; it provides information on the percentage of unvested and hence unprotected employees whose pension rights have been negatively impacted by the terminations. But it reveals nothing about the impact of the terminations on the Plan as a whole, which would seem to be important in determining whether, for ERISA purposes, a partial termination has occurred. As explained by Vincent Amoroso in *A Policy Premise to Partial Terminations, supra* at 8-44, utilizing this formula, at least in isolation from other evidence, can lead to unsound results. Consider, for example, a plan with 5,000 participants, 4,900 vested and 100 nonvested. During a reorganization, 50 nonvested employees are involuntarily terminated

without cause. If the *Gulf Pension* formula is used in isolation to determine if the significant percentage test is met, the reduction in plan participants is 50% (50 / 100 = 50%), despite the fact that only 1% of plan participants forfeited benefits as a result of the reorganization (50 / 5,000 = 1%). The Plan's proposed formula would seem to provide important information as to whether the employer is unduly benefitting from forfeitures, which the *Gulf Pension* formula does not.

The Plan argues that even under the *Gulf Pension* formula, however, it is entitled to summary judgment. If that is the test, the court disagrees. According to Household's human resource records, 862 nonvested participants were involuntarily terminated without cause from the Reorganization Entities between August 31, 1994 and June 30, 1996. During that same period, there were 6,391 nonvested participants in the Plan (4,374 at the beginning + 2,017 added during the period).[5] The Plan argues that using the *Gulf Pension* formula yields a percentage of

---

[5]Matz argues that the denominator is skewed because it includes the 3929 nonvested participants who became fully vested upon termination as a result of the 1995 amendment to the Plan. Thus, those participants count as nonvested participants for purposes of the denominator, yet upon termination, they were fully vested, so they do not factor into the numerator. This appears to be a situation unique to this case, due to the impact of the 1995 amendment. The solution, however, is not to count only those nonvested participants remaining in the Plan at the *end* of the period in question, as Matz urges. Under the *Gulf Pension* formula, the denominator is the number of nonvested participants at the beginning of the period, plus any nonvested participants added during the period. *Gulf Pension*, 764 F. Supp. at 1168. To do as Matz suggests would result in an artificially high number (his suggestion would not even count the nonvested terminees in the denominator). Another option would be to (1) calculate the percentage for the period before the amendment (August 31, 1994 through August 31, 1995), (2) calculate the percentage for the period after the amendment (September 1, 1995 through June 30, 1996), and (3) average the results. That would likely benefit the Plan even more, however. If the court understands the amendment correctly, the practical result is that there were no nonvested terminations after September 1, 1995. In that case, the percentage for the post-amendment period would be zero, and averaging zero with the percentage for the pre-amendment period would reduce the results by 50%. The court therefore follows the *Gulf Pension* formula without modification.

only 13.5%,[6] which is too low to be deemed significant.

There is a problem with the numbers the Plan used in its calculations, however. The numerator used by the Plan (862) includes only those nonvested participants who were laid-off or fired from the Reorganization Entities. According to Matz, this number is too low because some of the nonvested participants viewed by Household as voluntary terminees may qualify as involuntary terminees for purposes of the significant percentage test. The court agrees.[7] Although normally an employee who has voluntarily decided to resign does not count in determining whether a partial termination has occurred, *Morales*, 718 F. Supp. at 1302, there are exceptions. "[I]f an employee resigns, . . . the termination may still be counted if it is shown that the participant was constructively discharged . . . ." *Halliburton*, 100 T.C. at 240. For example,

---

[6] 862 nonvested, involuntary terminees divided by 6,391 nonvested participants = 13.5%.

[7] The court rejects Matz's argument that the numerator should include all nonvested plan participants who were involuntarily terminated from Household as well as any of its affiliates or subsidiaries during the period in question, rather than just those terminated from the Reorganization Entities. "An employer-initiated permanent reduction of a significant percentage of employees from a plan as part of a major corporate event may constitute a partial termination." *Collignon*, 796 F. Supp. at 1141 (citing *Sage v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885, 891 (10th Cir. 1988)). According to Matz, the "major corporate event" was the reorganization at Household involving the Reorganized Entities. In considering whether a partial termination occurred, the focus should be on the nonvested participants involuntarily terminated from the entities directly involved in the "major corporate event." Those are the entities that were actually closed or sold, so those are the employees who were left without the option of remaining in their positions. *Id*. The involuntary terminations from other Household entities are too remote to be considered. To allow discovery regarding whether involuntary terminations from other entities could somehow be related to the reorganization of the Reorganization Entities would authorize a limitless fishing expedition. Voluntary resignations from other entities are likewise out of the equation. The possibility that employees from other Household subsidiaries might have resigned, thinking that the reorganization was a sign of decline at Household that could potentially jeopardize their positions, is simply too attenuated.

an employee who finds another position and resigns "after it is clear that there is no prospect of continuing to work for the employer may . . . be considered as having been involuntarily terminated." *Id.*; *Collignon v. Reporting Servs. Co.*, 796 F. Supp. 1136, 1141 (C.D. Ill. 1992).

According to Household's human resources records, 266 nonvested participants voluntarily terminated their employment from the Reorganization Entities during the period in question. The defendant bears the burden of showing that those terminations were voluntary. *Gulf Pension*, 764 F.Supp. at 1167. For purposes of this motion and to avoid prolonging this litigation, the Plan is willing to concede that every one of those 266 employees left in anticipation of being fired or laid off (rather than to pursue a better job, relocate, go back to school, etc.). Counting all 266 of those employees among the involuntary terminations raises the percentage to 17.6%.[8]

Unfortunately, the court concludes that if the *Gulf Pension* formula is applied and it is assumed that the 266 "voluntary" terminees were in fact constructively discharged, the litigation must go forward. As mentioned earlier, although the result of the significant percentage test is generally the most persuasive factor, "all the facts and circumstances in the particular case" matter when determining whether a partial termination occurred. 26 C.F.R. § 1.411(d)-2(b)(1). Given the 20% guideline issued by the Treasury Department, courts have stated that a drop in employee participation in a benefits plan that is less than 20% could be significant "if accompanied by egregious abuse on the part of the employer." *Halliburton*, 100 T.C. at 237.

---

[8] $(862 + 266) / 6,391 = 17.6\%$.

Matz contends that a finding of partial termination may be appropriate here if there was some egregious conduct or bad faith on the employer's part, and that he should be allowed to pursue discovery on that issue. The court agrees.[9] This is a borderline case. It makes sense that in a borderline case, evidence of egregious behavior could tip the scales toward a partial termination finding.[10] The Plan's motion for summary judgment cannot be granted.

Finally, Matz's motion for partial summary judgment is denied. There are disputed issues of material fact as to whether there was a reorganization and whether the terminations at Hamilton, HMS, Household Bank and AHLIC were related to that single corporate event of reorganization. For purposes of ruling on the Plan's motion, the court assumed that Matz could prevail on those issues of disputed fact. Matz is not entitled to such a presumption on his motion.

---

[9]The court, however, rejects Matz's theory that a 1995 amendment to the Plan may be evidence of improper motive. The amendment at issue provided that effective September 1, 1995, any plan participant terminated for any reason would be deemed fully vested in his account. Matz hypothesizes that the amendment may have been "intended to foreclose a finding of partial termination of the Plan." (Pl.'s Mem. Opp. to Def.'s Mot. Summ. J. at 14.) If that proves to be true, Matz argues, then "Household has manipulated the law solely for its own benefit, to the detriment of Plan participants." (*Id.*) The theory that many employees (*i.e.*, 3929) were benefitted so that the Plan could escape liability for those situated as was Matz (*i.e.*,1128) is an inadequate basis for a finding of liability. "[P]lan amendments which adversely affect rights of employees to vest in benefits under the plan" are among the facts and circumstances the Treasury Department deems relevant in assessing whether a plan termination occurred. 26 C.F.R. § 1.411(d)-2(b)(1). The court will not read this to apply to amendments which advance vesting rights.

[10]It is also unclear whether using 20% as a guideline is appropriate here. The Treasury Department developed that guideline for IRS agents. The IRS, as previously noted, uses a different formula from either the *Gulf Pension* formula or the formula proposed by the Plan. That said, the *Gulf Pension* court referenced the 20% guideline, even though it did not follow the IRS's formula. 764 F. Supp. at 1164.

**Conclusion**

Both the Plan's motion for summary judgment and Matz's cross-motion for partial summary judgment are denied. Upon request, the court is prepared, albeit with regret, to certify this matter for another interlocutory appeal. This court's interpretation of the Seventh Circuit's holding in *Matz II* may well be incorrect, and the application of any formula other than that applied in *Gulf Pension* would almost certainly doom plaintiff's case.[11]

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: September 22, 2003

---

[11] Comparing nonvested, involuntary terminees to nonvested plan participants, the percentage in this case is 17.6%. But comparing nonvested, involuntary terminees to the plan participants as a whole yields only 9.4%. (862 + 266 = 1128 involuntary terminations of nonvested employees; 11,955 total plan participants during the relevant period; 1128 / 11,955 = 9.4%.)

13