UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT J. MATZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 96 C 1095 |
| v. | ) ) | Judge Joan B. Gottschall |
| HOUSEHOLD INTERNATIONAL TAX REDUCTION INVESTMENT PLAN n/k/a HSBC-NORTH AMERICA (U.S.) TAX REDUCTION INVESTMENT PLAN, | ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Robert J. Matz brings this action on behalf of himself and all similarly-situated former employees of Household International, Inc. ("Household"), who were participants in the Household International Tax Reduction Investment Plan ("the Plan") and whose matching pension benefit contributions from Household were forfeited when their employment was terminated. Matz alleges that the Plan violated the Employee Retirement Income Security Act of 1974 ("ERISA") by failing to declare a "partial termination" of the Plan, which would have resulted in the full vesting of matching contributions made by Household to the individual retirement accounts of the Plan participants. The Plan now moves for summary judgment. Because Matz has failed to demonstrate a genuine issue of material fact as to whether a partial termination of the Plan occurred, requiring full vesting of all matching contributions, the motion is granted.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

A brief discussion of the rules governing summary judgment motions in this district is warranted here. In addition to complying with the Federal Rules of Civil Procedure, the parties must also adhere to the Local Rules for the Northern District of Illinois and this court's Standing Order. Local Rule 56.1 provides that the moving party shall serve and file:

> 1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e);
>
> 2) a supporting memorandum of law; and
>
> 3) a statement of material facts as to which the moving party contends there is no genuine issue . . . .
>
> The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.

L.R. 56.1(a). All argument must be contained in the party's brief, not in the Rule 56.1 statement. Standing Order at 1-2. The court disregards any argument contained in the Rule 56.1 statement.

The party opposing summary judgment is required to respond with its own supporting

evidence, memorandum, and "concise response to the movant's statement . . . ." L.R. 56.1(b). The opposing party's Rule 56.1(b) statement should also contain "any additional facts that require the denial of summary judgment." *Id*. The opponent must include references to its supporting materials. *Id*. Failure to respond to a statement results in the court admitting the statement as true. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

## II. FACTS

For purposes of the motion for summary judgment, the court takes the following facts from the parties' Local Rule 56.1 Statements of Facts ("SOFs"), to the extent that they are supported by admissible evidence and relevant to issues raised in the motion. Where facts are disputed, the court takes no position as to which version of the disputed matter is correct. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Facts not supported by the cited evidence or irrelevant to the motion for summary judgment have been excluded from this summary.[1]

### A. The Plan

The Plan is a defined contribution employee pension benefit plan sponsored by Household (now known as HSBC Finance Corporation) for the benefit of the eligible employees

---

[1] The Plan moves to strike Matz's Rule 56.1 SOF for failure to cite admissible evidence, failure to cite to specific exhibits, and improper legal argument. (Def.'s Mot. to Strike, ECF No. 727.) The court grants that motion in part, as reflected in this summary of facts. Plaintiff's SOFs ¶¶ 4, 7, 14, 16, 17, 21, 22, 26-29, 32, 33, 37, 40, 47, 48, 60, 63, 64, 69, and 70-91 contain multiple facts in lengthy paragraphs, in violation of Local Rule 56.1. Not all of these facts are supported by record evidence, and some paragraphs contain legal argument and facts related to entities such as Household's Canadian, United Kingdom, and Australian operations, which are not relevant here. The statements that are supported by the record have been included in this summary. The court has disregarded the unsupported statements, legal arguments, and irrelevant facts. Plaintiff's SOFs ¶¶ 34-36 and 41 include commentary by outside entities such as analysts and industry reports; these documents describe Household's focus on cost-cutting under CEO William Aldinger, but they are not relevant to the company's internal decisions, and these facts have therefore been omitted. The Plan's SOFs ¶¶ 39-49 are also omitted from this summary; they discuss class-certification rulings irrelevant to this motion.

of Household and its subsidiaries. The Plan is intended to be a qualified profit sharing plan under Internal Revenue Code § 401(a), 26 U.S.C. § 401(a).

The Plan is governed by the Plan Document. The Plan assets are held, administered, and managed by the Vanguard Fiduciary Trust Company (the "Trustee") in accordance with the terms of a Trust Agreement. The Trust Agreement provides that, although Household may amend the Agreement at any time, no amendment may divert any of the Plan's assets to any purpose other than providing benefits to Plan participants and their beneficiaries or defraying the expenses of administering the Plan.

The Plan provides for individual accounts for each employee who elects to participate by making contributions to the Plan. Household makes matching contributions to the accounts of all contributing Plan participants every month. The contributions are made directly to the Trustee; Plan participants may direct the Trustee to invest the amounts allocated to their accounts into various Funds. Benefits under the Plan are based solely on the amounts contributed to each participant's account and any income, expenses, gains, and losses allocated to the account.

Under the Plan, participants were always fully vested in the amounts credited to their accounts that were attributable to their own contributions. Prior to September 30, 1995, the Plan contained a five-year graded vesting schedule for the matching contributions made by Household. Participants gained a vested interest in the matching contributions at the rate of twenty percent per year, becoming fully vested after five years of service.

For participants who separated from employment before September 30, 1995, the Plan provided that, if the participant's employment was terminated for reasons other than death, disability, or retirement, the participant would not receive the unvested portion of the account balance attributable to the employer's matching contributions. These matching contributions,

and earnings on the contributions, were forfeited by the participant and remained in the Plan for the benefit of the remaining Plan participants. Forfeited amounts could be used only for the benefit of active Plan participants by either: (1) restoring unvested account balances of Plan participants who had returned to their jobs with the Plan sponsor; or (2) reducing the sponsor's future matching contributions to the accounts of the remaining Plan participants.[2] Matching contributions could be returned to Household only if the contributions were made based on a mistake of fact or if the deduction for the contribution were disallowed. No earnings on the contributions could be returned. During the period at issue, no Plan assets reverted to Household; all assets remained in the Plan for the benefit of the Plan participants.

Before September 30, 1995, the Plan provided for full vesting of employer matching contributions if the Plan was terminated or partially terminated. Effective September 30, 1995, the Plan was amended to eliminate the five-year vesting schedule; as a result, after that date, any participant whose employment terminated for any reason was considered fully vested in his or her Plan account, including Household's matching contributions, and received a distribution of the full account balance. Thus, after September 30, 1995, forfeiture of benefits was not possible.

**B. Matz's Plan Participation and Legal Claims**

Matz, an individual residing in Wilmette, Illinois, is a former Plan participant. Matz was employed by Hamilton Investments, Inc. ("Hamilton Investments"), a wholly-owned subsidiary of Household, from March 28, 1989, until August 31, 1994. His employment was terminated when Household sold substantially all of Hamilton Investments' assets. As an employee of Hamilton Investments, Matz elected to make payroll contributions to the Plan, and Household

---

[2] Matz admits these facts with the qualification that "the earnings on those unvested contributions" were also "used to reduce Household's future matching contributions," but he cites only the 100-page Plan Document, without directing the court to the specific evidence supporting the qualification.

made matching contributions to his account. At the time his employment was terminated, Matz was sixty-percent vested in the matching employer contributions made to his account. He received a distribution from the Plan in the amount of $27,914.10, the full amount of his vested account balance, but he did not receive a distribution of the remaining forty percent of matching contributions to his account, valued at $7,288.92.

In February 1996, Matz filed a complaint, on behalf of himself and others similarly situated, seeking the non-vested portion of the employer matching contributions, pursuant to § 501(a)(1)(B) of ERISA, 29 U.S.C. § 1131(a)(1)(B). Matz claims that he is entitled to the matching contributions because a "partial termination" of the Plan occurred, requiring the contributions to become fully vested. This court has jurisdiction to adjudicate the dispute under § 502(e) of ERISA and 28 U.S.C. § 1331. Venue is proper pursuant to § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, and the facts alleged occurred here.

## C. The Alleged "Reorganization" of Household

Whether a partial termination of the Plan occurred depends in part on the percentage of Plan participants who lost coverage. That, in turn, depends upon which events are considered to be relevant in calculating the number of employees who were terminated. In this case, the parties dispute whether the only relevant event is the sale of Hamilton Investments, Matz's employer, or whether the sale of other Household entities is also relevant. A series of events resulting in terminations may be aggregated to determine whether a partial termination occurred if the evidence demonstrates that the events were related. *See* Rev. Rul. 2007-43, 2007-28 I.R.B. 45, 2007 WL 1816726 (IRS RRU) (June 26, 2007); *Matz v. Houshold Int'l Tax Reduction Inv. Plan*, 227 F.3d 971, 977 (7th Cir. 2000); *Weil v. Ret. Plan Admin. Comm.*, 750 F.2d 10, 12 (2d Cir. 1984).

Matz alleges that his participation in the Plan was terminated as a result of a "reorganization" of Household that "began on or about August 1, 1994 and ended on or about June 30, 1996." The alleged reorganization was implemented pursuant to a "policy adopted in (or before) 1994." The alleged reorganization consists of the following transactions: (1) the sale of Hamilton Investments on or about August 31, 1994; (2) the sale of Household's residential mortgage business, known as Household Mortgage Services ("HMS"), in or about December 1994; (3) the sale of the branches of Household Bank, fsb ("Household Bank") located outside of Illinois between February and September 1995; (4) the sale of a life insurance subsidiary, Alexander Hamilton Life Insurance Company ("AHLIC"), on October 6, 1995; (5) and the sale of the Illinois branches of Household Bank on or about June 28, 1996. Matz claims that these transactions were so "related" as to constitute a single corporate event, which he alleges resulted in a partial termination of the Plan. Matz contends that other activities during this time period, including the consolidation of corporate operations, also formed part of the reorganization.

1. Household's Pre-1994 Divestments

In 1985, Household began to restructure its operations away from being a diversified conglomerate. Household disposed of its merchandising business in 1985, its transportation business in 1986, and its manufacturing businesses in 1989 and 1990. Employee terminations resulting from the sale of these businesses are not part of Matz's alleged reorganization.

2. The "Strategic Think" Process

Matz argues that his employment was terminated as a result of a restructuring process that began in 1993, under then-CEO Don Clark. Clark had begun transitioning away from the active management of the Company, but when the person chosen to succeed him as CEO died suddenly in April 1993, he stayed on as a placeholder while Household selected his successor.

During this interim period, under Clark's direction, Household's management conducted a series of what were known as "Strategic Think" meetings to evaluate the competitive strengths and weaknesses of Household's business units. Four meetings were held in 1994. Household's management used an outside consultant, the Boston Consulting Group, to study the profitability and strategic positioning of each of Household's businesses. The meetings also allowed Clark to reacquaint himself with management issues and to evaluate internal candidates for CEO.

David Schoenholz, who served as Household's chief financial officer from 1994-2002, testified that the Strategic Think process resulted in no formal conclusions or recommendations. During the meetings held in 1994, Schoenholz testified, a consensus was reached to continue in the consumer finance and credit-card lending businesses and to strengthen them if possible, as those were Household's strongest businesses. (Def.'s SOF Ex. G (Schoenholz Dep.) 32:4-11.) Schoenholz testified that, during the meetings, management attempted to establish criteria to identify which businesses had competitive advantages and that the "criteria were evaluated on a case-by-case basis" with respect to each business. (*Id.* at 155:9-17.)

3. The 1994 and 1993-1996 Strategic Plans

Household prepared one and three-year strategic and operating plans that were presented to its Board of Directors each year. The 1994 Strategic Plan presented to the Board at the January 11, 1994, Board meeting asked, "[W]hat businesses should we be in and why?" It noted that the Strategic Think meetings were designed to address that question. The 1993-1996 Strategic Plan stated that Household had "[d]ominant market positions in the consumer and credit card segments" and "synergies . . . among business units." It identified "Liquidating Commercial Lines and Canada" as "[p]roblem businesses" and noted a "[l]ack of critical mass in some key markets and/or business units," as well as "[l]ess than satisfactory profitability in [the]

individual life business, and an "[i]nability to fully utilize deposit funding from Household [B]ank." (Pl.'s Ex. 17 (1993-96 Strategic Plan) at HO230970-HO230971.) The document identified as "corporate strategies" "[growing] new and existing businesses which generate consistently superior returns," "address[ing] these units which have not or may not meet these criteria," and "focus[ing] on our problem businesses and returning them to profitability." (*Id.* at HO230972.)

4. The Sale of Hamilton Investments

Household's 1993-96 Strategic Plan identified Hamilton Investments as a business that lacked "critical mass." (*Id.* at H0230971.) Meetings and studies in February 1994 addressed whether Household "want[ed] to be in the retail brokerage business." (Pl.'s SOF Ex. 93 (Strategic Study).) Clark informed the Executive Committee of the Board of Directors that management intended to pursue options regarding Hamilton Investments, including a possible sale. The decision to sell Hamilton Investments was approved by the Board of Directors on July 12, 1994, and the sale occurred on or about August 31, 1994. Randall Raup, who was the head of Household's planning department and reported to Schoenholz, testified that the decision to sell Hamilton Investments was made "primarily because Hamilton Investments was a relatively small player, and . . . given the size of the competition and [the fact that Hamilton Investments] was a very small business, we didn't see how that could fit into the overall long-term strategy." (Def.'s SOF Ex. F (Raup Dep.) 93:21-94:2.)

5. William Aldinger Becomes Household's CEO

William F. Aldinger replaced Clark as Household's CEO on September 13, 1994, after the sale of Hamilton Investments. Aldinger testified that he "had nothing to do with" the sale of Hamilton Investments. (Def.'s SOF Ex. A (Aldinger Dep.) 39:8-9.) He explained that he was

not "part of [the] decision-making" with respect to the sale (*id.* at 40:2-3), and that he "didn't have a clue as to what [management's] reasoning was" (*id.* at 41:1-2). Aldinger accepted the offer to become CEO on July 27, 1994 but did no work at Household until September 13, 1994.

When Household hired Aldinger to succeed Clark as CEO, there was no requirement that he share Clark's strategic vision for the company. Board of Directors member Robert Darnall, who served on the Board committee that recommended hiring Aldinger, testified that he believed the company was "getting a fresh perspective on the business." Household told Aldinger when he interviewed for the position that the Board was looking for someone with a "broad financial services background," who could be a "change agent" and who "could potentially increase [Household's] stock price and increase the earnings and the trajectory of those earnings."

Clark continued to receive reports about Household's management, but Aldinger testified that after he was installed as CEO, Clark did not influence his decisions regarding the strategic direction of the company:

> I think we had differences, but he would not step in and interfere. He made it very clear to me that when I took over, whatever I decided to do as CEO, he would support. And so I made decisions and didn't consult with him on those other than as a board member. . . . [T]o his credit, he stuck to his word and let us execute the way I saw fit.

(Aldinger Dep. 63:2-13.) Aldinger testified that he was "not aware of any specific evaluation of [Houshold's] businesses before [he] arrived" and that he "wanted a fresh look at everything."

Aldinger did not continue the Strategic Think meetings that had been conducted under Clark.[3] He testified that "in the early stages," he could recall Clark being present at only one management team meeting, "in October or November" of 1994. (*Id.* at 23:6-24:3.) Regarding the Strategic Think meetings, he testified:

---

[3] Matz disputes this fact but cites only his own SOFs, not record evidence, and the cited SOFs do not support the existence of a dispute.

Before I arrived, I knew nothing [about strategic meetings conducted under Clark]. After I arrived, it may have been mentioned to me that [Clark] had a method and approach, and I had one meeting my first month on the job, . . . which was the last meeting that he came to, had the consultants in it which never happened again, because I didn't include them in the meetings.

So that's the extent of what I knew about [Clark's strategic meetings]. And in my approach in the beginning based upon my discussion with him [Clark] was, I'm in charge. I do it my way. I wasn't really interested in what they had done before . . . because I had a different view of the world, and I didn't think that the performance . . . was knock out. . . . [M]y perception was twofold. One, the results were lousy . . . . And, two, my role was to do it my way, and I didn't want to be encumbered by, locked into, or biased by other actions. Period. I wanted to look at it fresh.

(*Id.* at 96:20-98:1.)

With respect to the strategic decisions made by Household during the alleged "reorganization" period, Raup testified, "I guess I would break it into kind of two different buckets . . . . before Bill Aldinger joined in his role versus after he joined." (Raup Dep. 92:18-24.) Raup further testified:

[W]hen Don [Clark] was in charge, there were two specific units we identified as [not] . . . part of our long-term strategy, and that would have been the Australian unit and Hamilton Investments . . . . Then when Bill Aldinger came on board and he was looking across all business units [,] . . . he ha[d] a different viewpoint in terms of what it was going to take for us to be successful . . . .

(*Id.* at 110:11-111:2.)

As CEO, Aldinger emphasized cost efficiency and economy of scale. He testified that his "stamp would have been to execute and to emphasize being a low cost producer" and to invest in the company's most profitable business rather than treating all of the businesses equally. (Aldinger Dep. 44:14-45:11.) To that end, Aldinger introduced the concept of the efficiency ratio—a measurement calculated by dividing expenses by revenue—as a criterion for evaluating Household's businesses. Schoenholz testified that Aldinger emphasized "cost structure" and "which businesses had the . . . potential to be the most efficient in their competitive market

space," criteria that "got added to the other elements as we began evaluating individual businesses on a one-by-one basis." (Schoenholz Dep. 155:19-156:10.)

Aldinger wrote a letter to Household employees on October 26, 1994, stating that "Low cost producers win," and that the company needed to "increase revenues and reduce costs." (Pl.'s SOF Ex. 147 (Oct. 26, 1994 Aldinger Letter).) He stated, "Beginning immediately, we will be looking for ways to streamline operations and remove redundancies. Unfortunately, some employees will be displaced. . . . Household will continue its commitment to place as many employees as possible in other areas of the company." (*Id.*)

Schoenholz testified that Aldinger "focused very quickly on efficiency and reducing head count across the board." (Schoenholz Dep. 154:10-11.) On November 11, 1994, Aldinger wrote to all Household employees: "I have just completed my first Strategic Plan review as your CEO . . . . As we reviewed the strategies for each business unit, we agreed upon the needed changes to position ourselves for the future. Over the last week you have heard about some of these initiatives, which include consolidation and downsizing of some units." (Pl.'s Ex. 148 (Nov. 11, 1994 Letter).)

Aldinger testified that, within the first six months of his tenure, he grouped Household's businesses into three broad categories: (1) core businesses including the consumer finance and credit-card subsidiaries; (2) businesses that warranted further investment, including AHLIC and the Illinois branches of Household Bank; and (3) businesses whose performance and profitability were not considered to be up to Household's standards, including HMS and the non-Illinois branches of Household Bank.[4] Aldinger testified that, early in his tenure, he expected the Illinois

---

[4] Matz states that he disputes this fact, but he cites only to nineteen paragraphs of his SOF, not to record evidence demonstrating a dispute. The summary of Aldinger's testimony matches the cited portion of his deposition. The court deems the fact admitted.

branches of Household Bank to be "part of our core business," but that "they would have to improve their performance" and "efficiency ratio." (Aldinger Dep. 98:14-18.) He testified that AHLIC's return on investment lagged Household's other businesses, and that he determined that investment should be diverted to businesses with more growth potential. (*Id.* at 116:22-117:15.)

Aldinger further testified that his decisions were "an evolving process":

[W]e didn't sit in a room and set down a strategic plan that said we're going to do A, B, C, and D. . . . I tried to get a handle on the company; on its strengths and its weaknesses. And what evolved over time was that some businesses were really good, some were really not so good, and some were in the middle, but we thought they would either . . . become really good or they would become sale items, but we didn't know. So we focused one at a time on the ones that were obvious, and in the early stages when I was there, [HMS] was obviously bad. The management was weak, the returns were terrible, and the projections for the future weren't good. So we made a decision late in [1994] that we would ultimately exit the business and sell it if we could.

(*Id.* at 28:11-29:4.) Aldinger testified that Household's performance was evaluated "[o]n a periodic basis . . . . And then we'd want to look at how we allocate our capital based on that and our investments." (*Id.* at 32:2-9.) Darnall testified, "These were all independent decisions made as businesses were evaluated within the financial services area . . . there wasn't any master refocusing." (Def.'s SOF Ex. D (Darnall Dep.) 46:9-16.) Raup testified that there was "never any grand plan," but rather an "evolving" strategy that adapted to "market conditions." (Raup Dep. 103:7-12.)

6. The Sale of HMS

HMS's prospects were discussed before Aldinger joined the company in September 1994. The 1993-1996 Strategic Plan and 1994 Operating Plan presented to the Board of Directors on January 11, 1994, noted "[l]ack of critical mass in some key markets and/or business units – i.e. . . . HMS." (Pl.'s SOF Ex. 17 (1993-1996 Strategic Plan) H1231971.) Schoenholz testified that he did not recall the nature of the discussions regarding HMS during the Strategic Think

meetings, although he assumed it was discussed, as management was "talking about different businesses." (Schoenholz Dep. 111:10-22.) HMS is mentioned in the meeting minutes from the May 25, 1994 Strategic Think Meeting. (Pl.'s SOF Ex. 8 (May 25 Meeting Minutes) LM00969.) A memo from Schoenholz to Clark dated August 4, 1994, stated that "[t]he short and intermediate term financial prospects for this business, as it is currently structured, are not attractive." (Pl.'s SOF Ex. 111 (Aug. 4, 1994 Schoenholz Memo.) H0254706.) Shusta also sent Clark a background paper about HMS in August 1994. (Pl.'s SOF Ex. 112 (Aug. 10, 1994 Shusta Memo.) None of the evidence in the record, however, indicates that a decision to sell HMS was made before Aldinger joined Household.

Aldinger testified that he decided that Household should exit the conforming mortgage origination business (HMS) in the fourth quarter of 1994 because it was "poorly run, returns were weak, and management was weak." (Aldinger Dep. 67:23-25.) A memo was sent to Household employees on December 13, 1994, stating that Houshold was discontinuing the first mortgage origination business. (Pl.'s SOF Ex. 139 (Dec. 13, 1994 Memo.).) At the January 10, 1995, meeting of the Board of Directors, Shusta presented a plan to liquidate HMS.

7. Household's Reports and Communications in Early 1995

The 1995 Operating Plan presented to the Board of Directors on January 10, 1995, stated:

In late 1994, significant steps were taken to set Household International on its new course. The investment brokerage unit [Hamilton Investments] was sold. The underperforming units of [HMS] and Australia are in the process of being divested. Significant restructuring has taken place at U.S. Consumer Banking, both in terms of improving operating costs and of refocussing its mission to that of a full service institution from that of only a deposit gatherer. . . . All businesses have been tasked with improving their efficiency ratios [and] focusing the scope of their activities to those which generate the greatest returns . . . .

(Pl.'s SOF Ex. 18 (1995 Operating Plan) H0007380.) At the January 19, 1995, meeting, the Board was presented with a plan to "substantially exit" the commercial finance industry. (Pl.'s

14

SOF Ex. 5 (Minutes of Board of Directors' Meeting Jan. 19, 1995) H0228698.) Colin Kelly, Household's Vice President of Human Resources, discussed the company's efforts to "reduce corporate-wide head count and effectively manage cultural change and employee morale issues as a result of the downsizing process." (*Id.* at H0228699.)

The 1995 Strategic Plan included an overview of corporate-wide reductions in employees and indicated that an "objective" was to "[r]educe corporate-wide head count by 4,000 by [December] 31, 1995." (Pl.'s SOF Ex. 135 (1995 Strategic Plan) H0107259.) The 1995 Board of Director's meeting presentation stated that the company had reduced staff by seven percent in 1994. (Pl.'s SOF Ex. 135 (1995 Board of Directors Presentation) H0107132.)

In a January 19, 1995, letter to Household employees, Aldinger stated:

By focusing on where we can compete to win and where we can gain the most, we've identified the markets where we want to grow, where we want to strengthen our position and where we'd do better to leave.

We're concentrating on growing five business units: Household Credit Services (HCS), Household Finance Corporation (HFC), HFC Bank (UK), Household Financial Services (HFS) and Household Retail Services (HRSI) . . . .

These five business units offer us the most profit opportunities. These are the areas where we can compete as a major contender. . . .

In the markets where we can't compete, we've exited. We found little opportunity to cross-sell brokerage services to our core customer base; therefore, we sold Hamilton Investments last year. Because of our small market presence, low profitability and declining mortgage volume, we closed [HMS] in December. In addition, we've decided to exit the Australian market because of an absence of solid market share . . . . Across Household, I see positive changes.

(Pl.'s SOF Ex. 42 (Jan. 19, 1995 Letter).)

Household's 1994 10-K Form stated:

During 1994, the Company also began to refocus its emphasis on certain businesses in order to take advantage of its operating efficiencies and competitiveness in the marketplace and initiated a number of measures to reduce costs, including discontinuation of its first mortgage origination business in the

United States; . . . and the initiation of a reduction in the company's workforce by approximately 12 percent. . . . The company also sold [Hamilton Investments].

(Pl.'s SOF Ex. 23 (1994 10-K Form) P00268-69.)

Household's Annual Report for 1994, sent to shareholders, stated:

Our goal for Household is to become one of the lowest-cost producers in the financial services industry. We are also determined to focus, selectively, on our best opportunities. This means investing our assets in those businesses offering the greatest potential, such as our high-return HFC and credit card businesses. . . . And in some cases it means fixing businesses, such as cutting costs and increasing revenues in our Canadian and Household Bank operations. Over the last seven months, a number of significant initiatives were completed to streamline operations, reduce costs and improve productivity. We sold our brokerage business, discontinued the origination of low margin first mortgages and sold our Australian operation. . . . Additionally, we are restructuring our consumer banking operations. On February 7[, 1995] we signed agreements for the sales of the Virginia, Maryland and California branch networks. This will increase earnings and enable us to focus on the Midwest, where Household Bank has a greater market share . . . . We are also streamlining the 'back office' operations of several of our businesses. . . . And we are consolidating a number of corporate functions to improve efficiency. Collectively, these actions will reduce our workforce by 12 percent.

(Pl.'s SOF Ex. 71 (1994 Annual Report) H0088365.) The 1994 Annual Report also contained an interview with Aldinger, who emphasized the "efficiency ratio" and stated that Household would focus on HFC, the credit-card business, and consumer banking in the Midwest. (*Id*. at H0088367-71.)

8. The Sale of Household Bank Branches Outside of Illinois

In the fourth quarter of 1994, Household Bank acquired twenty-six bank branches located in Illinois. The decision to purchase the branches was approved by Household's Board of Directors on April 11, 1994, under Clark. The acquisition closed in the fourth quarter of 1994, after Aldinger's installation as CEO.

Aldinger, Schoenholz, Household Bank President Chuck Colip, and the Board of Directors were involved in making decisions about Household Bank. Aldinger testified, "We

would as a collective group make a decision. I would direct that strategy and say that I would prefer to do it." (Aldinger Dep. 79:20-22.) Within the first three to six months of his tenure, Aldinger determined that the branches of Household Bank located outside of Illinois were subscale in terms of: (1) the number of branches per market and (2) the deposits per branch (which averaged $40 million, compared to an average of $80 million among competitor banks). The 1995 Operating Plan presented at the January 10, 1995, Board of Directors meeting stated that Household Bank was "[c]urrently a 'follower' in all markets, although position varies (as does opportunity for growth)." (Pl.'s SOF Ex. 18 (1995 Operating Plan) H0007443.) Aldinger also implemented a change in the business strategy applicable to Household Bank. Previously, its primary mission was to generate deposits as a funding source for loans made by the company, but Aldinger insisted that it be evaluated by its profitability as a stand-alone business.

Aldinger testified that "three to six months" into his tenure, Household decided to "refocus on Illinois," where the company had scale, and to sell the branches outside of Illinois. (Aldinger Dep. 74:1-10.)[5] In December 1994, Aldinger and Schoenholz began evaluating what Household might get for the bank branches outside of Illinois. A January 6, 1995, memorandum to Household Bank employees from Colip stated, "We . . . determined that it would be more efficient and profitable to focus our network in a concentrated region rather than pursue a national bank strategy." (Pl.'s SOF Ex. 145 (Jan. 6, 1995 Colip Memo).) On January 19, 1995, Aldinger advised all Household employees that Household had determined to focus the network of Household Bank in a concentrated region (Illinois) rather than compete on a national scope. Aldinger testified that, at the time the decision was made to sell the branches outside Illinois, Household still "wanted to be in the banking business." On February 17, 1995, Colip sent a

---

[5]     Matz states that he disputes this fact, but he cites twenty-three paragraphs of his SOF, without explaining the basis for the dispute. Aldinger's testimony is reproduced accurately.

communication to Household Bank employees stating that Household had "no intention of exiting the banking business entirely." Aldinger testified that in the first eight months of his tenure, he expected the Illinois branches "to be part of our core business," although they needed to achieve a better "efficiency ratio." (Aldinger Dep. 98:14-18.)

At the March 15, 1995, Board of Directors Meeting, the Board approved the sale of the California, Maryland, Virginia, and Ohio branches of Household bank. The sale of the Indiana branches was announced in April 1995. In that announcement, Aldinger was again quoted as stating that Household intended to focus its consumer banking operations in Illinois. (Pl.'s SOF Ex. 152 (Apr. 7, 1995 Memo.).)

9. The Sale of AHLIC

The ultimate decision to sell AHLIC was based on work that Schoenholz, Raup, and others at Household had been conducting since 1993. The Boston Consulting Group prepared a strategic assessment of AHLIC dated June 18, 1993. (Pl.'s SOF Ex. 14 (AHLIC Strategic Assessment).) AHLIC was also discussed at a November 9, 1993, Board of Directors meeting. The 1993-1996 Strategic Plan and 1994 Operating Plan mentioned AHLIC's "[l]ess than satisfactory profitability." (Pl.'s SOF Ex. 17 (1993-1996 Strategic Plan) H1231971.)[6]

There is no evidence, however, that Household decided to sell AHLIC prior to 1995. Schoenholz testified that during the Strategic Think meetings, no consensus was reached on what to do with AHLIC. (Schoenholz Dep. 65: 17-21.) A September 6, 1994, memo from Raup to Clark and Shusta recommended a "'wait and fix' strategy." (Pl.'s SOF Ex. 12 (Sept. 6, 1994 Raup Memo.) LM00984.) When the decision was made to discontinue HMS and sell the non-

---

[6]       Matz states in his SOF ¶ 46 that in December 1993, Household commissioned Morgan Stanley to evaluate the market for a sale of AHLIC, but the exhibit he cites is a JP Morgan document. There is no evidence that JP Morgan was retained in this capacity by Household.

Illinois branches of Household Bank, Household had not yet determined to sell AHLIC. In November 1994, a memo to AHLIC employees stated that "no significant change of direction" was foreseen. (Pl.'s SOF Ex. 104 (Nov. 3, 1994 Gilmer Memo.).) On January 19, 1995, Aldinger sent an internal communication to Household employees stating that Household's goal was to strengthen AHLIC's market position.

In February 1995, Household retained Morgan Stanley to assist in exploring a possible sale of AHLIC.[7] Prior to this engagement, and at the suggestion of a Morgan Stanley representative, a meeting was held at which an insurance industry expert advised Aldinger and Schoenholz regarding competitive trends, industry dynamics and growth prospects within the life insurance industry, as well as strategic options for AHLIC. Morgan Stanley prepared an analysis of the possible sale of AHLIC dated March 1, 1995. (Pl.'s SOF Ex. 105 (Morgan Stanley Analysis).) At its May 10, 1995, meeting, Household's Board of Directors engaged in a lengthy discussion with the company's management team about AHLIC and approved a resolution by which "Management of the Corporation was empowered to implement the strategy for AHLIC as presented at this meeting."

Aldinger testified that he decided to sell AHLIC because its return on equity, return on assets, and "overall income were [not] up to the standards" of other Household businesses, and he believed resources invested in AHLIC would be better invested in growth areas of the company. (Aldinger Dep. 116:25-117:15.) The sale of AHLIC to Jefferson Pilot Corporation was approved by the Executive Committee of the Board of Directors on August 8, 1995. The sale closed on October 6, 1995.

---

[7] Matz states that he disputes this fact, but he cites only his SOF ¶ 49, which does not support the existence of a dispute. The fact is deemed admitted.

AHLIC employees who transferred to Jefferson Pilot became eligible to participate in a retirement plan sponsored by Jefferson Pilot. The accounts of those transferred employees, which were fully vested at the time of the sale, were transferred to the Jefferson Pilot plan.[8]

10. Other Layoffs in Corporate Departments

Additional layoffs in corporate departments took place in 1994 and 1995. The employees of Operations Support Services (OSS) provided support services to other Household business units. Employees of OSS were involuntarily terminated in 1994. A memorandum to Household employees dated December 2, 1994, stated that OSS was being merged with Household Financial Network to create Household Technology Services (HTS). HTS provided technology support to Household's entire organization. The 1995 Operating Plan mentioned as a "strategy" the reduction of HTS's total full-time employees by twelve percent. (Pl.'s SOF Ex. 135 (1995 Operating Plan) H0107245.)

11. Household's Reports and Communications in Early 1996

Household's 1995 Annual Report stated, "Initiatives to improve the operating efficiency of certain businesses and to exit others began in the fourth quarter of 1994 and continued throughout 1995. The number of employees at December 31, 1995, was approximately 13,000, down from 15,500 at year-end 1994." (Pl.'s SOF Ex. 89 (1995 Annual Report) H0233576.) The 1995 Annual Report listed a series of "Key Efficiency Moves in 1995," including consolidation of facilities, divisions, processing centers, data management, and human resources, redesign of the data network, and standardized processing between Canada and the U.S. (*Id.* at H0233559.) It stated that the company "is now focused on its high-return businesses, principally consumer finance and credit cards in the United States, the U.K. and Canada." (*Id.* at H0233552.)

---

[8]     Matz qualifies his admission of this fact but identifies no record evidence supporting a dispute. The fact is deemed admitted.

12.  The Sale of the Illinois Branches of Household Bank

By early 1996, Aldinger had determined that the Illinois branches of Household Bank would not become a core business for Household.  Household's Board of Directors approved the sale of the Naperville branch of the bank on February 28, 1996.  The Board of Directors Executive Committee approved the sale of the Illinois branches to Harris Bank on April 9, 1996, and the Illinois branches were sold to Harris Bank in June 1996 for $277 million.

Aldinger explained the decision by emphasizing "shareholder value," Harris Bank's "integrity, treatment of employees and management strength," and that the proceeds "will provide us greater profit when we invest the money in the business where we have better market share and higher returns."  The press release announcing the sale explained that "Household continues to focus on its core, higher return businesses in credit cards and consumer finance." Aldinger reiterated that point to Household's employees, stating, "Our focus must continue to be on our core credit card and consumer finance businesses, which give us the best return on our investments and help us maintain our leadership position."

13.  Household's Reports and Communications in Late 1996 and Early 1997

Household's 1996 Annual Report stated, "During 1996, 1995 and late 1994, the company completed several major initiatives designed to benefit future operating results by focusing on higher return businesses and improving efficiency."  (Pl.'s SOF Ex. 164 (1996 Annual Report) H0088057.)  It stated that salaries and fringe benefits were down since 1994, "primarily due to a lower average number of employees compared to the prior years, which resulted from actions initiated in late 1994 and continued through mid-1996 to improve the operating efficiency of certain businesses and to exit others." (*Id.* at H0088061.)  These steps included selling consumer branch banking operations, selling AHLIC, and exiting from the first mortgage business.  (*Id.*)

Household's 1996 10-K stated:

In late 1994 the Company initiated additional actions to further narrow its focus on higher return consumer finance businesses. Initiatives were also undertaken to improve the Company's operating efficiency and productivity. A major component of this effort was to discontinue operations in the mortgage banking and consumer banking industries. Consequently, in late 1994 the Company terminated origination of first mortgage loans and in 1995 sold its domestic and Canadian first mortgage servicing portfolio. In 1995 the Company also narrowed its focus in the insurance industry by selling its individual life and annuity product lines. In 1995 the Company sold all consumer bank branches located outside metropolitan Chicago . . . . The Company completed its exit from consumer banking in 1996 by selling its Chicago area branch offices . . . .

(Pl.'s SOF Ex. 67 (1996 10-K Form) P00487.) Schoenholz testified that these paragraphs in the 1996 and earlier 10-K's described the process, which began under Clark, of "establishing criteria to identify which businesses had competitive advantages . . . . And then those criteria were evaluated on a case-by-case basis" with respect to the individual businesses. (Schoenholz Dep. 155:10-17.) The Annual Reports and 10-K also reference Household's efforts to improve the efficiency of the subsidiaries which it did not divest, by means such as consolidating operations.

14. Acquisitions of Other Businesses

To Aldinger, one key to achieving efficiency was economy of scale. This involved not just divestments, but the expansion of Household's workforce. Raup testified that the concept of "core business" at Household was an evolving one; it referred to businesses in which Household was "a reasonably large player with a core set of skills, returns, cost structure and critical mass that was equal to or greater than the competition in the marketplace." (Raup Dep. 172:3-18.)

Household acquired businesses, adding employees and Plan participants as a result, after June 30, 1996. Between 1994 and 1998, Household expanded its workforce.[9] On or about June 23, 1997, Household acquired Transamerica Financial Services Holding Company ("TFSHC"), a

---

[9]    Matz disputes this fact, but he argues only that this was not "the relevant time period."

branch-based consumer finance subsidiary of Transamerica Corporation. As a result, an additional 1,354 individuals became employed by Household or its subsidiaries and eligible to participate in the Plan. On or about October 21, 1997, Household acquired ACC Consumer Finance Corporation ("ACC"), an automobile finance company. An additional 378 individuals became employed by Household or its subsidiaries as a result of the acquisition of ACC. On or about April 7, 1998, Household entered into a merger agreement with Beneficial Corporation ("Beneficial"), and Household acquired Beneficial on or about June 30, 1998. An additional 9,269 individuals became employed by Household or its subsidiaries as a result of the acquisition of Beneficial. Combined, these acquisitions more than doubled Household's workforce.

**D. The Plan Data and Matz's Objections to the Data**

The Plan provided Matz's counsel with various sources of data regarding Plan participants. The Plan maintained termination files ("Term Files") for participants whose participation in the Plan ceased during the period of Matz's alleged reorganization. The Term Files were produced to Matz's counsel. They are organized by Plan participant and contain information regarding the dates of Plan participation during the alleged reorganization period. The Term Files contain Plan Distribution Request Forms which were signed by participants whose participation in the Plan ceased (unless their participation ceased because of death).

The Plan also maintained a database of information regarding Plan participation and terminations during Matz's alleged reorganization period (the "Plan Data"). The Plan produced this information to Matz's counsel in both paper and electronic formats. Matz's counsel also deposed Household's Director of Employee Benefits regarding the Plan Data.[10]

---

[10] Matz argues that the scope of the deposition was limited, but he does not explain what topics he was prevented from questioning the Director about.

Household maintained a database regarding the employment and, where applicable, the termination of employment, of Household employees (the "Human Resources Database"). The Human Resources Database collected data from employees or managers regarding the reason for the employment terminations. The Plan Data furnished to Matz's counsel included information from the Human Resources Database reflecting the reason for the termination of those Plan participants whose participation ceased during Matz's alleged reorganization period.

The Plan also collected and made available to Matz's counsel personnel files maintained by Household's business units during the alleged reorganization period (the "Personnel Files"). Finally, the Plan produced to Matz's counsel a database of information regarding Plan participation maintained by the Plan Trustee (the "Vanguard Database").

Matz raises objections to the Plan Data. He disputes that a Term File was provided for every terminated participant. He disputes that the information in the Personnel Files was accurately recorded for every participant and that a Personnel File was made available for every participant. In support, he cites his attorney's affidavit, which states that not every Plan participant in the database has a Term File, and that the Files are inaccurate. (Pl.'s SOF Ex. 221 (Gillespie Aff.) ¶ 33.) The attorney, however, lacks personal knowledge of the data's accuracy.

Matz further argues that the Plan's data is inaccurate because many Household employees were constructively discharged; he argues that they left their jobs because they knew they would be terminated. In support of this statement, he cites several exhibits. Exhibit 211, the affidavit of Alicia Grogan, states that she found another job because she believed her position at OSS would be eliminated. Exhibit 212, the affidavit of Daniel Rouse, states that he worked at HTS but found a new position because he did not want to risk becoming unemployed. Exhibit 213 indicates that Cindy Miller resigned from Household Bank and mentioned a change in the

company's direction as a reason for her resignation. Exhibit 214 suggests that Maria Costabile was interested in taking an early retirement from Household Bank. Having reviewed these exhibits, the court concludes that none supports the statement that "many" Household employees were constructively discharged. The exhibits indicate that the employees in question voluntarily sought new positions. They do not show that the employees would have actually been terminated had they not left the company. Matz also points to lists of employees in Exhibits 215, 216, and 217, which he argues show that employees were displaced and did not leave Household voluntarily. But, again, the documents do not support the statement. It is unclear whether the employees mentioned in Exhibits 215 and 216 were offered other employment at Household. Exhibit 217 is a list of names; it does not indicate when it was created or whether the employees listed were placed elsewhere within the company.

Finally, Matz argues that there are inconsistencies in the data provided by the Plan. The Plan acknowledges that, because the Plan Data and the Vanguard Database were maintained by different record keepers, the information reflected in the two sets of information is not entirely consistent. For example, with respect to certain participants, Vanguard appears to have listed as the "termination" date the date on which the participant's Plan account was distributed, processed or deferred, whereas the Plan Data lists the date of separation from service as the termination date. Matz disputes the Plan's explanation of the inconsistency, but he does not offer an alternative explanation. On March 21, 2012, the Plan's counsel provided Matz's counsel with spreadsheets that listed the participants as to which Matz's counsel had made inquiry regarding an alleged discrepancy between the databases, along with notes that addressed each alleged discrepancy. The Plan's counsel proposed a meeting to discuss the spreadsheet and

notes. Matz disputes that the explanations provided by the Plan were satisfactory, but he admits that no additional meeting was held to follow up on the information provided by the Plan.

Magistrate Judge Kim, who supervised discovery in this case, denied Matz's request to take additional depositions on April 17, 2013. He concluded that Matz had "had ample opportunity to obtain the information by discovery in the action." (Tr. Apr. 17, 2013, ECF No. 652-5.) This court overruled Matz's objections to that order on Jun 19, 2013, finding no clear error in the order and emphasizing that Judge Kim had already extended the discovery cut-off multiple times. (June 19, 2013 Order, ECF No. 664.)

**E. The IRS Audit of the Plan and Plan Data**

In or about October 1996, the Internal Revenue Service commenced an audit of the Plan, and the data maintained by the Plan, for the years 1992, 1993 and 1994. As part of its audit, the IRS took the position in a communication to the Plan dated September 14, 1998, that "the sale of Hamilton Investments is a partial termination per Regs. 1.411(d)(2)(b)." (Def.'s SOF Ex. 24 (IRS Information Document Request (EP-078) dated September 14, 1998) H0212416-18.) The IRS examined only the number of Plan participants terminated as a result of the sale of Hamilton Investments itself, not the terminations that occurred during the alleged reorganization period.

Household responded to the IRS's statement of position in a letter dated October 26, 1998, explaining that other Household employees also belonged to the Plan, and that the number of Hamilton Investments employees terminated was in fact a small percentage of the total number of Plan participants. The IRS completed its audit and issued its final examination report on April 6, 1999. The IRS made no finding that the Plan was partially terminated and found no material inaccuracies in the Plan Data. The IRS audit included a review of information regarding

Plan distributions in 1995 and 1996.  After the audit, the IRS issued favorable determination letters finding the Plan qualified under the applicable provisions of the Internal Revenue Code.

**F.  Numbers of Plan Participants and Involuntary Terminations**

　　1.  Total Number of Plan Participants

The Plan had 8,681 participants on August 31, 1994, when Hamilton Investments was sold.  Between September 1, 1994, and June 30, 1996, 3,274 new participants were added.  Although Matz states that he disputes these figures, his objections relate to the number of participants terminated, not the number of participants in the Plan, and he presents no evidence suggesting that a different total of Plan participants is accurate.  As Matz has cited no record evidence demonstrating a dispute as to the number of Plan participants, the Plan's SOFs ¶¶ 138-140 regarding the total number of Plan participants are deemed admitted, and the court concludes that the total number of Plan participants during the alleged reorganization period was 11,955.

　　2.  Number of Employees Terminated from Hamilton Investments

According to the Plan, 408 Plan participants ceased participation in the Plan as a result of the involuntary termination of their employment at Hamilton Investments.  Matz states that he disputes this number.  He argues that twenty-one employees were listed incorrectly as voluntary terminations:  twenty as "alternate positions" and one as "normal retirement."  Matz cites his lawyer's affidavit in support of this argument.  (Pl.'s SOF Ex. 221 (Gillespie Aff. ¶¶ 37).)  The lawyer has no personal knowledge of why the employees were terminated.  He relies on the fact that the Plan Data suggests that they left after the company was sold.

　　3.  Number of Employees Terminated from AHLIC

According to the Plan, twenty-seven Plan participants were terminated as a result of the sale of AHLIC.  An additional 313 Plan participants ceased participating in the Plan because

their employment was transferred as a result of the sale of AHLIC. Matz argues that eight other employees should be included in these totals. He again relies only on the affidavit of his attorney, which states that the Plan Data showed that eight additional participants were transferred to Jefferson Pilot. (Gillespie Aff. ¶¶ 42-43.)

4. Number of Employees Terminated from Household Bank

According to the Plan, 1,141 Plan participants ceased participating in the Plan when their employment by Household Bank was involuntarily terminated. This total does not distinguish the employees terminated from the Illinois and the non-Illinois branches. Relying on his lawyer's affidavit, Matz argues that an additional fourteen participants were terminated during the relevant period. (Gillespie Aff. ¶¶ 44-46.)

5. Number of Employees Terminated from HMS

According to the Plan, 264 Plan participants ceased participating in the Plan when their employment by HMS was involuntarily terminated. Matz argues that "far more" persons were terminated as a result of the sale of HMS. In support, he cites to a paragraph of his own SOFs. The court has examined the exhibits cited in that paragraph. They do not support the existence of a dispute.[11] In the absence of evidence demonstrating a genuine issue of fact, The Plan's SOF ¶ 146 is deemed admitted; the court finds that 264 Plan participants were terminated from HMS.

---

[11]  Matz cites communications to employees that state that HMS's Wood Dale, Illinois office was closed. One communication states that 93 employees would be displaced on or about October 1, 1995. (Pl.'s SOF Ex. 180 (July 18, 1995 Letter).) A message dated November 9, 1994 states that 111 employees were displaced in October (presumably October 1994), 21 of whom were placed in other Household positions "to date." (Pl.'s SOF Ex. 181 (Nov. 9, 1994 Message).) A December 1994 communication stated that HMS's workforce had already been reduced by about 500 employees, without specifying when that occurred, and that about 200 additional reductions would be made. (Pl.'s SOF Ex. 139 (Dec. 13, 1994 Memo.).) None of Plaintiff's exhibits indicates how many displaced employees were Plan participants or demonstrates that more than 264 Plan participants were displaced during the alleged "reorganization" period.

### 6. Number of Employees Terminated from HTS and OSS

According to the Plan, 215 Plan participants ceased participating in the Plan during the alleged reorganization period because their employment by HTS was involuntarily terminated. Another two Plan participants ceased participating in the Plan during that period because their employment by OSS was involuntarily terminated.[12]  One Plan participant was involuntarily terminated from Household's Treasury Division.[13]  Relying on his lawyer's affidavit, Matz argues that nineteen additional Plan participants may have been terminated during the relevant period.  (Gillespie Aff. ¶¶ 47-49.)

### G. Tax Consequences of and Motives for the Termination of Plan Participants

The Seventh Circuit has emphasized that "tax motives and tax consequences" may be relevant in determining whether a partial termination occurred.  *Matz v. Household Int'l Tax Reduction Inv. Plan*, 388 F.3d 570, 578 (7th Cir. 2004).   During the period of alleged reorganization, all funds contributed to the Plan were used to administer the Plan or to benefit the Plan's participants.  The only "tax consequence" that Matz identifies is that Household was able to reduce its future contributions to the Plan by using forfeited matching contributions and the earnings of those contributions.   No record evidence suggests that a reduction in Plan participation was motivated by a desire by Household to secure a tax benefit.[14]   Household further maintains that none of the transactions that occurred during the alleged reorganization were implemented because of their effect on Plan participation.  Matz disputes this, but the nineteen paragraphs of his SOF which he cites do not mention Plan participation.

---

[12]     Matz disputes this fact, but the exhibit he cites does not demonstrate a dispute.

[13]     Matz disputes this fact, but the exhibit he cites does not demonstrate a dispute.

[14]     Matz disputes this fact but cites no evidence demonstrating a dispute.

### III. Analysis

Under § 411(d)(3) of ERISA, if a defined contribution benefit plan is terminated or partially terminated, "the amounts credited to the employees' accounts[] are nonforfeitable." 26 U.S.C. § 411(d)(3). In other words, in the event of a partial termination of the Plan, terminated employees such as Matz were required to become fully vested in the portion of their accounts reflecting Household's contributions, and were thus entitled to their entire account balances. If no partial termination occurred, however, the Plan is entitled to summary judgment, as Matz is not entitled to the unvested portion of his account balance.

The term "partial termination" is not defined by the statute. A Treasury Regulation instructs the IRS to consider "all the facts and circumstances of a particular case." 26 C.F.R. § 1.1411(d)-2(b)(1); *see also Matz*, 388 F.3d at 573 ("So vague a regulation is no help to anyone."). Despite the fact-intensive nature of the inquiry, it is appropriate to grant summary judgment on a partial termination claim if the relevant facts are not in dispute. *See, e.g.*, *Admin. Comm. of Sea Ray Emps.' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 989 (6th Cir. 1999) ("*Sea Ray*"); *Moody v. Skaliy*, No. 05-CV-2337-JEC, 2007 WL 1496691, at *7 (N.D. Ga. Mar. 27, 2007); *Taylor v. Food Giant, Inc. Salaried Emps. Pension Plan*, No. C 84-253A, 1984 WL 8144, at *3 (N.D. Ga. Nov. 30, 1984).

In 2004, the Seventh Circuit noted that two issues remained to be resolved in determining whether a partial termination of the Plan occurred in this case: (1) whether the terminations of employees from different Household subsidiaries should be considered a single termination; and (2) the number of participants whose coverage was canceled because they left involuntarily (as opposed to voluntarily). *Matz*, 388 F.3d at 575-76. The court now resolves those issues.

## A. The Alleged "Reorganization" Did not Constitute a Series of Related Events for Purposes of Calculating the Number of Participants Terminated

The first issue before the court is whether the termination of Plan participants from Hamilton Investments should be aggregated with terminations from other Household businesses in calculating the total number of Plan participants who lost coverage. The applicable period in determining the turnover rate of plan participation is typically the plan year, but it may be longer where a series of related events occur over multiple years. *See* Rev. Rul. 2007-43; *see also Matz*, 227 F.3d at 977 ("Matz can combine terminations from 1994, 1995 and 1996, provided that he [can] show that the corporate events of those years were related."); *Weil*, 750 F.2d at 12 (suggesting that terminations in 1980, if "related," "should be considered in determining whether" a plan was partially terminated in 1981).

A Texas district court concluded in *In re Gulf Pension Litigation* that "a series of actions designed to reduce [the] partially redundant work force" resulting from a merger between Gulf and Chevron should be aggregated to determine whether a partial termination occurred. 764 F. Supp. 1149, 1169 (S.D. Tex. 1991). After the merger, a multiple-phase program was implemented to reduce surplus employees, beginning in 1984 and continuing to mid-1986. *Id.* Chevron simultaneously sold assets to finance the merger, shedding thousands more employees. *Id.* at 1169-70. As the terminations were all related to the merger, the court considered them as a single event in analyzing whether a partial termination occurred. *Id.* at 1170.

In *Sea Ray*, however, two events resulting in terminations of plan participants within a short period of time were found to be unrelated and were not aggregated. *Sea Ray* involved a period of layoffs between 1989 and 1991 resulting from declines in boat sales other than yachts, causing the number of employees who were plan members to decline from 3,832 to 3,060 by June 1990. Then in 1990, Congress passed a federal luxury tax that affected yachts. The number

of participants in the plan subsequently shrank to 1,968 by June 1991. *Sea Ray*, 164 F.3d at 984. The Sixth Circuit, affirming the district court's finding that no partial termination occurred, "agree[d] that the economic downturn in 1989 and the federal luxury tax in 1990, while both leading to dire consequences at Sea Ray, stem[med] from two independent factors." *Id.* at 988.

In this case, Matz's theory is that Household's activities from 1994 to 1996 were linked together by a process of "reorganization" or "restructuring" that began with the Strategic Think meetings under Clark and continued under Aldinger. Through that process, Household determined that it should be involved in a different mix of businesses, and it executed that reorganization over a two-year period. Matz points to various corporate documents that describe Household's de-acquisitions during this period as a process of restructuring to become a "low-cost operator." For example, the company's 1994 10-K states, "During 1994, the Company also began to refocus its emphasis on certain businesses in order to take advantage of its operating efficiencies and competitiveness in the marketplace and initiated a number of measures to reduce costs." Matz contends that he has produced sufficient evidence to create an issue of material fact as to whether the decisions to sell the various entities were related.

The Plan, on the other hand, argues that the transactions Matz construes as related were the result of independent decisions, not a single corporate event. At no time did Household have a plan of reorganization tying together the sale of Hamilton Investments with the sale of the other entities. Moreover, the Plan argues, the decision to sell Hamilton Investments was made while Clark was CEO. When Aldinger became CEO, he introduced his own criteria for evaluating Household's businesses—emphasizing the efficiency ratio—and did not continue the Strategic Think process initiated by Clark. In addition, the Plan argues that the period Matz defines as a

period of reorganization is arbitrary, and that Household's asset mix was in flux well before 1994 and continued to evolve after 1996.

The court agrees with the Plan that the record evidence, summarized at considerable length above, does not support a conclusion that the sales of Household's various businesses were a series of "related" events for purposes of the partial termination analysis. It is true that the divestments occurred within a fairly short period of time. But that alone is insufficient to render them related. *See e.g.*, *Sea Ray*, 164 F.3d at 988. And more importantly, the evidence shows that (1) Household never had a plan of reorganization that encompassed the sale of the different entities, (2) the decisions to sell the entities were made at different times, (3) each business was evaluated individually, based on the market conditions affecting that segment of the financial industry, and (4) the time period identified as relevant by Matz is arbitrary.

First, the undisputed facts demonstrate that there was no overarching plan of reorganization of Household that encompassed the different transactions at issue. Under Clark, Household's management held several Strategic Think meetings. Those meetings resulted in no formal conclusions, and no decisions were made during those meetings to sell the entities in question. Then, in the middle of the alleged reorganization period, and *after* the sale of Hamilton Investments, a new CEO came on board. He introduced different priorities into the planning process. As CEO, Aldinger did not continue the Strategic Think meetings, and Clark allowed Aldinger to determine his own strategies for the company. Although various corporate documents refer to Household's change in course and mention the sale of the various businesses, the documents were written after the transactions at issue took place; they do not create an issue of material fact as to whether the transactions, when made, were the result of a common plan.

Second, the decisions to sell the different entities in question were made sequentially, not at the same time. At the time when Hamilton Investments was sold, while Clark was CEO, Household's management had not decided to sell any of the other entities. The decision to sell HMS was made under Aldinger. Before 1995, Household had not decided to sell AHLIC. In the fourth quarter of 1994, Household Bank actually acquired 26 bank branches located in Illinois. The company had no plan at that time to sell the Illinois branches, and it did not decide to do so until 1996. The facts thus show that the divestment decisions were made on an evolving basis.

Third, the undisputed evidence shows that each business was evaluated on its own terms. Unlike in *In re Gulf Pension Litigation*, there was no major corporate event that drove the employee reductions over multiple years. Aldinger and Household's management did base their decisions on general principles, such as the importance of cost structure and efficiency. Insofar as Household attempted to maximize profits for its shareholders, the decisions were all motivated by the same goal. That goal, however, is one pursued by all corporations.

But with respect to each business, Household had to evaluate the relevant market, the competition, and the projected return on investment before deciding whether continued investment in that business was warranted. Some of the businesses were located in different states (and countries—although Household's foreign businesses did not employ Plan participants). The actual circumstances motivating the sale of each business, such as the fact that Hamilton Investments was a "small player" in the retail brokerage business and the fact that the Household Bank branches outside of Illinois averaged only $40 million in deposits, were unique.

Finally, there is no meaningful way to isolate the decisions made between 1994 and 1996 as a distinct event that caused a partial termination of the Plan. The only thread tying the decisions together is that the company attempted to act in the interest of its shareholders and to

maximize its return on investment. But that strategy did not end in mid-1996. Although Matz's

alleged reorganization excludes acquisitions that occurred after mid-1996, they resulted from the

same restructuring strategy that led to the earlier divestments: an emphasis on efficiency, return

on investment, and market share, and an effort to concentrate Household's operations in higher-

return businesses. Household's acquisition of TFSHC in 1997 had the effect of adding over a

thousand new participants to the Plan. Household's acquisitions of Beneficial and ACC resulted

in a doubling of the number of Plan participants.

In sum, rather than isolating a specific event that caused a loss in coverage to Plan

participants, Matz has carved out a time period during which a significant number of Plan

participants were terminated, in an effort to reach a threshold triggering a presumption that the

Plan was partially terminated. But the record evidence demonstrates that the events that led to

terminations of Plan participants are not sufficiently related that they may be aggregated for the

purpose of the partial termination analysis.

**B.     The Number of Plan Participants Terminated from Hamilton Investments Establishes a Conclusive Presumption That No Partial Termination Occurred**

1. Methodology

In its 2004 opinion, the Seventh Circuit set out the following set of presumptions to be

applied in determining whether a partial termination occurred:

> We shall generalize from the cases and the rulings a rebuttable presumption that a
> 20 percent or greater reduction in plan participants is a partial termination and that
> a smaller reduction is not. How rebuttable? . . . . We assume . . . that there is a
> band around 20 percent in which consideration of tax motives or consequences
> can be used to rebut the presumption created by that percentage. A generous band
> would run from 10 percent to 40 percent. Below 10 percent, the reduction in
> coverage should be conclusively presumed not to be a partial termination; above
> 40 percent, it should be conclusively presumed to be a partial termination.

*Matz*, 388 F.3d at 577-78.[15]

The Seventh Circuit also clarified the way that the percentage of plan participants terminated should be calculated. The denominator is the total number of participants in the Plan, calculated by adding the number of participants at the beginning of the applicable period and the number added during the period. The applicable period is the plan year, unless a series of related events occurred over multiple years. The numerator is calculated by determining the number of plan participants who lost coverage. The vested status of a participant is irrelevant. *See id.* at 575-76. Certain severances from employment are not considered: voluntary severances, routine turnover, or coverage by a plan that is a continuation of the plan under which they were previously covered, even if maintained by a new employer. *See id.*; Rev. Rul. 2007-43 (explaining that participants transferred to a different employer but still covered under a plan that was a continuation of the sponsored plan are not considered to have been severed).

2. Calculation of the Percentage of Plan Participants Terminated

The Plan argues that 408 Plan participants were terminated from Hamilton Investments. Matz argues that twenty-one additional participants should be included in the total. If they are included, this would bring the total to 429 terminations. These are the possible numerators.

As to the denominator, the court agrees with the Plan that the terminations occurring between 1994 and 1996 should not be aggregated. Therefore, the correct denominator is the number of participants in the Plan at the end of 1994, the Plan year during which Hamilton Investments was sold. *See* Rev. Rul. 2007-43. In its submissions to the court, however, the Plan relies on the wrong denominator. It has provided evidence as to the total number of Plan

---

[15] The Seventh Circuit noted that "should the IRS decide on its own to revisit the issue, we would give its views significant weight and therefore the rule we have just formulated for deciding such cases as this should be considered tentative." *Id.* at 578.

participants at the end of *1996*. That would be the proper denominator under Matz's theory, but it is not correct under the Plan's theory that only the sale of Hamilton Investments is relevant.

To correctly calculate the percentage of Plan participants who were terminated, the court needs to know how many Plan participants there were as of December 31, 1994, the end of the 1994 Plan year. It is undisputed that there were 8,681 participants as of August 31, 1994. The exhibits cited by the parties address how many Plan participants were added between August 31, 1994, and June 30, 1996, but not how many were added or terminated between August 31, 1994, and December 31, 1994.

In Household's letter to the IRS disputing the IRS's September 1998 position as to whether a partial termination had occurred, Household pointed out that the total number of Plan participants during 1994 was 10,013. (Pl.'s SOF Ex. 25 (Oct. 26, 1998 Baker Letter).) The record also shows that Household acquired twenty-six Illinois bank branches in the fourth quarter of 1994, which suggests that the total number of Plan members would have increased during that quarter. The plan to liquidate HMS, which resulted in the termination of 264 Plan participants, was presented at the January 10, 1995, meeting of the Board of Directors.

The court concludes that, although the parties have not established the exact number of Plan participants during the 1994 Plan year, the record compels a conclusion that there were more than 8,681 Plan participants on December 31, 1994. In order to construe the evidence as favorably to Matz as the record will permit, the court will use that figure as the denominator for purposes of this motion.

Using the Plan's figures and this conservative denominator, the resulting percentage of Plan participants terminated is (408/8681 =) 4.7%. Using Matz's figures, the percentage is

(429/8681 =) 4.9%.[16]  As the percentage of Plan participants terminated is less than ten percent, a conclusive presumption applies:  no partial termination occurred.  *See Matz*, 388 F.3d at 577-78. On this basis, the Plan is entitled to summary judgment.

**C.     Even if the Terminations are Considered in the Aggregate, No Partial Termination Occurred.**

1.  The Relevant Terminations

Matz argues that a dispute of material fact exists as to how many Plan participants were terminated during the alleged reorganization period, and that this precludes summary judgment. The court disagrees.  As an initial matter, only Plan participants who were terminated by the alleged reorganization entities, and Plan participants who were terminated from OSS, HTS, and Treasury as a result of the alleged reorganization, will be considered in determining the total number of terminations.[17]

Although Matz argues that other terminations occurred as part of Household's efforts to streamline its operations, he does not argue that those severances are related to the alleged reorganization, and nothing in the record supports that conclusion.  Matz contends that Household was consolidating human resources functions, collections, and other operations during the alleged reorganization period, but that is an entirely different theory of reorganization than the one on which he relies in identifying 1994-96 as the relevant period.  Matz's theory is based on Household's changing mix of businesses, which he argues was based on the company's evaluation of strategic opportunities in the various financial markets, and was the mission of the Strategic Think meetings.  Only terminations resulting from that alleged strategy will be tallied

---

[16]     Using the Plan's figures and the denominator taken from the Baker Letter to the IRS, the percentage would be (408/10,013 =) 4.1%.

[17]     Matz has moved to redefine the class to include Plan participants other than those terminated as part of the alleged reorganization.  (Pl.'s Mot. to Redefine the Class, ECF No. 679.)  That motion is denied.

in determining the number of Plan participants who lost coverage. If any efforts to improve efficiency in a company over various plan years may be aggregated into a "series of related severances," the rule that only terminations that occurred in a single plan year should normally be considered would be swallowed by the exception for related severances. Furthermore, the court has found no cases in which unrelated severances in other departments were included in the total of terminated plan participants resulting from a corporate event. Thus, terminations from entities other than those that were part of the alleged reorganization will not be considered related for purposes of the partial termination analysis.

Nor may Plan participants who left the company voluntarily, for reasons such as retirement, be included in the tally. Routine turnover is excluded for purposes of the partial termination calculation. Furthermore, employees transferred to a different employer who remained covered under a plan that is a continuation of the Plan maintained by Household are not considered as having been severed. *See* Rev. Rul. 2007-43. Thus, the employees transferred to Jefferson Pilot are excluded, as their Plan accounts were transferred to Jefferson Pilot's defined contribution plan.

### 2. The Percentage of Plan Participants Terminated

With these principles in mind, the court calculates the percentage of Plan participants who were terminated as a result of Matz's alleged reorganization. The undisputed evidence establishes that the total number of Plan participants during the relevant period was 11,955. This is the denominator. To calculate the numerator, the court totals the employees terminated from (1) Hamilton Investments, (2) AHLIC, (3) Household Bank, (4) HMS, and (5) HTS, OSS, and Treasury (for reasons related to the alleged reorganization). The following table lists the numbers as set forth by the Plan and by Matz.

|  | **The Plan** | **Matz** |
|---|---|---|
| Hamilton Investments | 408 | 429 |
| AHLIC | 27 | 27[18] |
| Household Bank | 1,141 | 1,155 |
| HMS | 264 | 264 |
| HTS/OSS/Treasury | 218 | 237 |
| **TOTAL** | 2,058 | 2,112 |

Based on these numbers, the percentage of Plan participants who were terminated during the alleged reorganization period is between 17.21% (using the Plan's figures) and 17.67% (using Matz's figures). Thus, even when the terminations resulting from the sale of the alleged reorganization entities are considered together, they amount to less than twenty percent of Plan participants. A rebuttable presumption applies that the reduction in Plan participants was *not* a partial termination. The court now turns to whether Matz has produced any evidence to rebut that presumption.

3. Tax Motives and Consequences

Addressing the full vesting rule set out in § 411(d)(3), the Seventh Circuit explained that "[t]he purpose of the rule is to prevent plan terminations motivated by the prospect of a tax windfall[,]" at the expense of the participants who are not yet fully vested. *Matz*, 388 F.3d at 573. The appellate court was "unconvinced by an alternative rationale sometimes suggested for the rule—to protect nonvested employees' expectations of receiving pension benefits." *Id*. Accordingly, the court emphasized that "the only relevant facts and circumstances should be the tax motives and tax consequences involved in the reduction in plan coverage." *Id.* at 578.

The Seventh Circuit also explained the nature of such a windfall:

Provided that certain requirements are met, the interest or other earnings in an individual retirement account are not taxed as they accrue. . . . Suppose the

---

[18] Matz argues that eight additional Plan participants were transferred to Jefferson Pilot, but these do not figure into the total of Plan participants who were terminated because their Plan accounts would have been transferred to Jefferson Pilot's plan.

employer terminates the plan. Were it not for the special rule on terminations that is the focus of this case . . . . [t]he portion of the employer's contributions that had not yet vested would revert to the employer . . . [and] the amount by which its contributions had grown as a result of the pension plan's investing them would have escaped being taxed.

*Id.* at 572-73.

Matz argues that the Seventh Circuit's opinion has been displaced by the IRS's revenue ruling of June 26, 2007, which concluded, without addressing whether evidence existed to rebut a presumption, that a termination of more than twenty percent of employees constituted a partial termination. Rev. Rul. 2007-43. But even were the court to adopt the framework of the ruling, it would not help Matz. The revenue ruling suggests that all that matters is whether more than twenty percent of Plan participants were terminated. That would mean that no partial termination occurred in this case.

The court does not believe, however, that the 2007 revenue ruling frees this court from following the directive of the Seventh Circuit. The revenue ruling cited to the Seventh Circuit's 2004 opinion. Although it did not address tax consequences, it did not explicitly reject the Seventh Circuit's analysis either. It is unclear whether the ruling terminated the inquiry recommended by the appellate court prematurely because the fact pattern at issue included no evidence rebutting the presumption, or whether the IRS rejected the very idea of a rebuttable presumption. For these reasons, the court does not find the 2007 revenue ruling persuasive insofar as it might support an analysis different from that required by the Seventh Circuit.

Using the Seventh Circuit's framework, Matz has presented insufficient evidence of tax motivations or consequences to rebut the presumption that no partial termination occurred. During the period of alleged reorganization, all funds contributed to the Plan remained in the Plan and were used to administer the Plan or to benefit the Plan's participants. No contributions

reverted to Household. The only "tax consequence" that Matz identifies is that Household was able to reduce its future contributions to the Plan by using forfeited matching contributions and the earnings on those contributions. But that is not the sort of windfall the Seventh Circuit described. *See Matz*, 388 F.3d at 572-73 (stating that the assets would "revert to the employer"). The record also demonstrates that no reduction in Plan participation was motivated by a desire by Household to secure a tax benefit. None of the transactions that occurred during the alleged reorganization were implemented because of their effect on Plan participation.

4. Non-Tax Benefits

Even if non-tax benefits to Household resulting from the termination of Plan participants are considered in evaluating whether a partial termination occurred (and the Seventh Circuit has advised that they should not be), there is no evidence that significant benefits to the company resulted from the Plan terminations. Although the forfeited matching contributions remained in the Plan, and Matz alleges that Household's future matching contributions to the Plan were reduced accordingly, the Plan was amended so that, after September 30, 1995, all matching contributions immediately vested. The company did not benefit at all from forfeitures after that date. Several of the transactions at issue in this case occurred after September 1995. The sale of AHLIC closed on October 6, 1995. The Illinois branches of Household Bank were sold to Harris Bank in June 1996.[19] It follows that even this benefit to the Plan was limited.

Nor does the record contain evidence demonstrating that the sale of Household's businesses was motivated by an effort to profit from the termination of Plan participants from the

_____

[19] The data provided to the court does not break down the number of employees terminated from the non-Illinois branches of Household Bank in March and April 1995 and the number terminated from the Illinois Branches in 1996. The total number of Household Bank employees terminated was between 1141 and 1155 people—a sizeable portion of the total number of Plan participants who were terminated. As Household Bank was concentrated in Illinois, a majority of these participants were likely terminated when the Illinois branches were sold in 1996.

Plan.  In the reams of exhibits Matz has provided to the court, the Plan is never mentioned in connection with the decisions to sell the alleged reorganization entities.  And finally, there is no evidence that the financial soundness of the Plan was affected by the sale of the businesses.  *See Sea Ray*, 164 F.3d at 989 ("[N]one of the parties allege that the layoffs at Sea Ray between 1989 and 1991 financially impaired the Plan.").

In conclusion, even if the terminations of Plan participants from the alleged reorganization entities are aggregated, the undisputed facts establish that no partial termination occurred.  The Plan is entitled to summary judgment on this basis as well.

## IV. Conclusion

Based on the number of Plan participants terminated and the absence of any tax benefit to Household resulting from the terminations, the court concludes that no partial termination of the Plan occurred that required the full vesting of matching contributions to Matz's account. There being no material facts at issue, the Plan's motion for summary judgment is granted.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  March 26, 2014